2022 IL App (4th) 210349

NO. 4-21-0349

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 1, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| DAVID H. GHARRETT, | ) | No. 11CF369 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Rebecca Simmons Foley, |
| | ) | Judge Presiding. |

JUSTICE BRIDGES delivered the judgment of the court, with opinion
Justices DeArmond and Steigmann concurred in the judgment.

**OPINION**

¶ 1     Following a May 2013 bench trial, defendant, David H. Gharrett, was convicted of

first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2010)) for the death of three-year-old D.C.

and was sentenced to 76 years' imprisonment. Defendant subsequently filed a *pro se* petition for

postconviction relief alleging a claim of actual innocence. The trial court summarily dismissed the

petition as frivolous and patently without merit, and defendant now appeals this first-stage

dismissal. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3     We previously summarized the facts of this case in defendant's prior appeal (see

*People v. Gharrett*, 2015 IL App (4th) 130960-U), and we restate the relevant facts here.

¶ 4        In May 2011, the State charged defendant by indictment with six counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2010)) for the death of three-year-old D.C.

¶ 5                        A. Trial Proceedings

¶ 6        In May 2013, the court held a bench trial, during which the following evidence was presented. On April 28, 2011, defendant was at home with D.C. and D.G. (D.G. is defendant's son, who shares the same mother with D.C.). Around 4 p.m., a neighbor, Geoff Davis, saw defendant outside with D.C. and D.G., yelling for someone to call 9-1-1. D.C. was unresponsive and was eventually transported to Advocate BroMenn Regional Medical Center and later flown to OSF St. Francis Hospital.

¶ 7        Dr. Rahul Chawla, the attending physician and pediatric critical care specialist at OSF St. Francis Hospital, examined D.C. and observed generalized bruising on D.C.'s chest, abdomen, arms, and back. His initial exam indicated D.C. had a brain injury. He ordered a computerized axial tomography (CAT) scan of D.C.'s head, which showed brain damage caused by swelling due to a lack of oxygen. Dr. Chawla determined that D.C. had suffered a severe anoxic brain where she had been deprived of oxygen for an extended period and was most likely brain dead.

¶ 8        Dr. Channing Petrak, a pediatrician at OSF St. Francis Hospital, is a pediatric child abuse specialist. She was called to the intensive care unit to consult on D.C.'s medical condition. She reviewed D.C.'s medical history and charts and observed that her skull's suture lines were starting to separate, where you could see areas of "big lucency." She testified that when you have cerebral edema, it will begin to push apart those suture lines in a child of D.C.'s age. The suture line separated because of the pressure in the skull caused by the brain swelling, and "it's [the brain] trying to find a path of least resistance." She testified to a reasonable degree of medical certainty

that the cause of injuries and trauma she observed in D.C. were due to abusive head trauma and child abuse.

¶ 9          Officer Travis Cornwall testified that, when he arrived at the scene, responding to a 9-1-1 call, he observed a male holding D.C. and appeared to be giving chest compressions with one hand. He said she was not breathing, so he instructed him to move her inside. He checked and did not see anything obstructing her airway, and he immediately began compressions. The compressions were discontinued once the ambulance personnel arrived on scene. He then inquired of defendant what had happened with the child. Defendant stated that:

> "he had her go into the bedroom to start cleaning some things up. And he was on the couch. She—she came back out of the bedroom and sat down next to her brother and looked up at him and said, 'David,' and then vomited on her shirt and on the floor, and then fell backward and became unresponsive."

Defendant went on and said that:

> "he went over to her and noticed that she wasn't—he was trying to wake her up and she wouldn't wake up. And so he took the shirt off of her because it was dirty and threw it on the floor, and then searched for his phone. He was unable to find the phone, and wasn't able to get her to wake up, so he took her outside."

¶ 10          At the scene, defendant next spoke with police chief Ted Lyons. Defendant told Lyons he sent D.C. to a room in the house to clean up dog feces as punishment for something that occurred earlier. He said when she was done, he brought her back out, and they sat on the couch to watch a movie. At some point after that, she vomited and became unconscious. Defendant indicated that D.C. may have choked on some peppers she ate. Defendant said he could taste hot peppers when he gave D.C. CPR.

¶ 11        Defendant also spoke with Sergeant Chad Witkowski. Defendant told Witkowski he was at home babysitting for and caring for both children and that no one else was in the house. He said that D.C. got in trouble from the night before for humping the floor and that he made D.C. clean up animal feces in the bedroom as punishment. He eventually allowed D.C. to come out of the bedroom and sit with him and D.G. to watch T.V. At one point, D.C. said "David," vomited, and then became unresponsive. Defendant moved D.C. to the dining room for more light and placed her on the floor. Unable to find a telephone, defendant took D.C. and D.G. outside to look for help. Witkowski asked defendant if it was possible D.C. choked on or consumed anything in the residence, to which defendant indicated he did not believe so. Defendant then asserted that he thought D.C. choked on hot peppers as he smelled it in her vomit while giving her CPR.

¶ 12        Trooper Brandon Smick took digital images of D.C. while she laid in the hospital bed. The images indicated bruising to the chest, abdomen, head, back, right forearm, upper left arm, left thigh, and the area near the right nipple and the sternum. The images also showed an abrasion on the right elbow and a defect in the tongue.

¶ 13        Defendant called several medical experts to refute and counter the various findings of the State's medical experts. None of defendant's experts suggested that D.C.'s cause of death was from choking or eating jalapenos or drinking hot sauce. One doctor, Dr. Shaku Teas, testified to not finding any blunt force trauma to D.C.'s brain.

¶ 14        D.C. was pronounced dead on April 29, 2011, after which Dr. John Denton performed the autopsy of D.C. During his initial external examination, Dr. Denton observed five bruises on D.C.'s head, four of which were "fresh." One bruise was a 1½-inch pattern contusion, reflecting what D.C.'s head must have struck. Dr. Denton also observed multiple bruises on D.C.'s abdomen. He observed a fresh group of blue and red bruises on her skin, which directly overlaid

- 4 -

the laceration of the artery and the bleeding in the duodenum in her upper abdomen. The bruising was deep and went all the way through the muscle wall. One bruise went through to the ribs, also indicating blunt force trauma. He further observed multiple bruises on D.C.'s extremities, the largest of which was on her upper left arm. The most significant bruises were three circular pattern bruises ranging from three-tenths to four-tenths of an inch between the sternum and belly button. Dr. Denton testified these bruises were considerably lower than where one would expect to observe CPR bruising. He also observed three similar bruises on D.C.'s back, which were deep and fresh. Dr. Denton concluded these bruises were consistent with a man's knuckles.

¶ 15        Dr. Denton next performed an internal examination of D.C. Her abdomen was filled with 350 cubic centimeters of blood. There was a laceration of her duodenum, pancreas, and gastroduodenal artery, which should not have been there. Her spleen and liver showed bruising. Dr. Denton found that the trauma he observed in these organs was associated with the three bruises over her skin and the full-thickness muscle bleeding, also right over that area. D.C.'s postmortem X-rays showed brain swelling, which caused D.C.'s skull growth plates to begin to separate. Blood was found between the outer layer of D.C.'s brain and skull. Optic nerve and retinal hemorrhaging were also noted in the back of D.C.'s eyes. Dr. Denton testified these types of injuries are caused by acceleration and deceleration of the head. Based on this information, Dr. Denton concluded based on a reasonable degree of medical certainty that D.C. died of blunt force trauma to the head and abdomen.

¶ 16        The State presented statements as well as audio and visual recordings of the in-station police interviews of defendant. Detective Tim Tyler conducted the first interview of defendant. Defendant told Tyler that, on the day of the incident, he was told D.C. was "humping" the floor the previous night. As punishment, he had her clean up dog "shits" from the bedroom. At

some point, D.C. came into the living room, and when defendant looked over, she had vomit in her hands. D.C. said "David" and then fell backward and was unresponsive. Defendant moved D.C. to the dining room, where he tried CPR. It looked like D.C. was vomiting jalapenos, and when defendant gave her breaths, he could taste them. There was a jar of jalapenos in the dining room, but D.C. never ate any before. Defendant could not find his phone, so he ran outside with D.C. and D.G. in his arms, yelling for his neighbor to call 9-1-1. Defendant continued to do CPR. At the conclusion of the interview, defendant was allowed to leave.

¶ 17        Tyler conducted a second interview of defendant. Defendant repeated the same story he told during the first interview. However, he added that he thought D.C. was choking, so he tried to do the Heimlich maneuver and CPR. Defendant was informed that the autopsy had revealed numerous bruises on her back, arms, and chest, and there was no evidence that D.C. had choked on anything. He was told that she had instead died of a traumatic brain injury and internal abdominal bleeding. In response, defendant stated he pushed on D.C.'s stomach to try to get her to puke but could not explain the bruising on her back, arms, or chest. After further questioning, defendant later added that once D.C. had vomited, he ran into the bathroom with D.C. and "dropped" her into the bathtub, causing her head to strike the bathtub. Defendant said he did not tell the rescue or hospital personnel about her fall because he did not think it was the cause of her problems. After Tyler told defendant his story of dropping D.C. in the bathtub did not match D.C.'s injuries, defendant stated he "pretty much tossed" her into the bathtub but did not intend to hurt her.

¶ 18        During a third interview, while insisting he was not mad at D.C. when he tossed her into the bathtub, he later admitted he "flew off the handle a little bit and that he tossed her into the tub."

¶ 19 The trial court also received testimony regarding D.C.'s prior injuries and discipline inflicted by defendant, which consisted of (1) when D.C. was approximately one year old, she suffered a fractured ankle after the defendant stepped onto her ankle while getting D.C. a bottle; (2) three weeks prior to D.C.'s death, defendant picked D.C. up by her shoulders and threw her approximately 10 feet; (3) defendant would punish D.C. by forcing her to eat hot peppers; (4) defendant was once seen performing a "karate kick" to D.C.'s chest; and (5) defendant inflicted "cracking," a punishment where D.C. had to put her feet on a couch and put her hands on the floor in a push-up position.

¶ 20 Following the evidence and closing arguments, the trial court found defendant guilty. The trial court found the "case turn[ed] largely upon the medical evidence." On this evidence, the court discounted defendant's theory that the injuries to D.C. were caused by defendant's attempt at CPR and instead found that, consistent with Dr. Denton's findings, the bruising on D.C.'s stomach was consistent with a man's knuckles. The court noted defendant's inconsistent statements as to what led to D.C. becoming unresponsive that he provided to the law enforcement officers, including his final version where he acknowledged he "flew off the handle" and tossed D.C. into the bathtub.

¶ 21 B. Posttrial Motion and Sentencing

¶ 22 In June 2013, defendant filed a posttrial motion for a new trial, asserting the "court erred in denying his motion *in limine* concerning prior bad acts, 'other crimes,' and the propensity evidence admitted in his trial." On July 26, 2013, the trial court denied the motion and sentenced defendant to 76 years in prison. On direct appeal, defendant challenged the admission of prior bad acts and evidence of prior injuries and instances of abuse upon the victim. This court affirmed his conviction and sentence in *Gharrett*, 2015 IL App (4th) 130960-U.

¶ 23                                     C. Postconviction Petition

¶ 24            On March 23, 2021, defendant filed a *pro se* postconviction petition alleging "actual innocence" based on newly discovered evidence consisting of an affidavit from his brother, Ricky Gharrett (Ricky). In Ricky's affidavit, he averred that he was the one who watched D.C. while his brother slept and that he was the one who punished D.C. by forcing her to eat jalapenos and drink hot sauce. Ricky further stated that D.C.'s death "would never of happend [*sic*] in the first place" if he had not punished D.C. Defendant also attached his own affidavit, indicating his suspicions that D.C.'s injuries were somehow attributable to Ricky and that "more went on that morning."

¶ 25            On May 19, 2021, the circuit court summarily dismissed the petition in a written order finding the petition and accompanying affidavits failed to establish a claim of actual innocence based on newly discovered evidence. Citing *People v. Savory*, 309 Ill. App. 3d 408 (1999), and *People v. Barnslater*, 373 Ill. App. 3d 512 (2007), the court ruled that the newly discovered evidence was required to show "total vindication or exoneration," and because the affidavits did not rise to the level of totally exonerating defendant from the crime he was convicted of, the court dismissed the petition as being frivolous and patently without merit.

¶ 26            This appeal followed.

¶ 27                                          II. ANALYSIS

¶ 28            On appeal, defendant argues that the trial court erred in summarily dismissing his *pro se* petition at the first stage. He asserts that his petition was sufficient to state a gist of a constitutional claim of actual innocence based on newly discovered evidence in the form of an affidavit from his brother. Ricky, in his affidavit, admitted to being the one who punished D.C. by making her eat jalapeno peppers and drink hot sauce. Ricky further stated that he did not "believe

it's fair that my brother David is doing 76 years for something he never meant to happen, something I truly believe would never of happened in the first place," if he had not made D.C. eat the peppers and drink the hot sauce as a punishment. Defendant contends that Ricky's affidavit constitutes newly discovered evidence that warrants setting aside his conviction and granting him a new trial.[1] Defendant challenges the trial court's finding that his affidavits did not reach the point of totally exonerating him of the crime for which he was convicted, and that they did not constitute newly discovered evidence.

¶ 29                    A. Post-Conviction Hearing Act

¶ 30        The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)) establishes a procedure by which a criminal defendant may collaterally attack his conviction or sentence based upon a substantial violation of federal or state constitutional rights. At the first stage, the court must accept as true and liberally construe all of the allegations in the petition unless contradicted by the record. *People v. Walker*, 2019 IL App (3d) 170374, ¶ 13. "If the trial court finds in the first stage of proceedings that the petition is frivolous or patently without merit, it shall summarily dismiss the petition ***." *People v. Moore*, 2018 IL App (3d) 160271, ¶ 15. We review a trial court's dismissal of a postconviction petition *de novo*. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009).

¶ 31        Because the conviction of an innocent person violates the due process clause of the Illinois Constitution, an imprisoned criminal defendant has a right in a postconviction petition to assert a claim of actual innocence based upon newly discovered evidence. *People v. Morgan*, 212 Ill. 2d 148, 154 (2004). Accordingly, from a procedural standpoint, a claim of newly discovered evidence is resolved similarly to any other claim brought under the Act. *People v. Ortiz*, 235 Ill.

---

[1] We note that appellate counsel's prayer of relief is that we reverse the trial court and remand this cause for second-stage postconviction proceedings.

2d 319, 333 (2009). Thus, a *de novo* standard of review similarly applies to the question "of whether, as a matter of law, a colorable claim of actual innocence has been asserted." *People v. Robinson*, 2020 IL 123849, ¶ 40. "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *Id.* ¶ 47.

¶ 32                                    B. Total Vindication Standard

¶ 33          Defendant's principal argument is the trial court erred in applying the "total vindication" standard that had been expressly repudiated by our supreme court in *Robinson*, 2020 IL 123849, in dismissing his first stage postconviction petition.

¶ 34          In *Robinson*, the defendant filed a motion for leave to file a successive postconviction petition, alleging actual innocence. *Id.* ¶ 21. The defendant claimed he had no involvement in the murder for which he was convicted and that Tucker, a fellow gang member, had committed the murder. *Id.* ¶¶ 21-23. In support of the petition, the defendant attached affidavits from multiple witnesses who observed Tucker in the vicinity of the murder on the night in question, holding an "A.K.," and another who averred that Tucker had confessed to the killing. *Id.* ¶¶ 25, 28. The trial court determined that the affidavits were newly discovered and material evidence; however, they did not totally vindicate or exonerate the defendant. *Id.* ¶ 30. The trial court denied the defendant's request for leave to file a successive postconviction petition, and the appellate court affirmed. *Id.* ¶¶ 30, 33.

¶ 35          The supreme court noted that both the trial and appellate court had erroneously applied the incorrect standard, requiring evidence of total vindication or exoneration to support a claim of actual innocence. *Id.* ¶ 55. In reversing the lower courts, the supreme court held that "a standard that requires evidence of total vindication or exoneration to support a claim of actual

innocence" is incorrect. *Id.* The court held that new evidence may be conclusive even if it does not completely exonerate defendant (*id.* ¶ 48) and further, it requires only that the defendant present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt (*id.* ¶ 56).

¶ 36    Here, the trial court dismissed defendant's petition as being frivolous and patently without merit. In its written ruling, the court specifically found that the standard that must be applied to an actual innocence claim requires the newly discovered evidence "rise to the level of totally exonerating" defendant of the crime for which he was convicted. As the supreme court has specifically rejected the total vindication or exoneration standard in *Robinson*, the trial court erred in applying an outdated standard in considering the sufficiency of defendant's and Ricky's affidavits.

¶ 37    Although we find the trial court erred in applying the incorrect standard, our review does not end here, as we may affirm the summary dismissal of a postconviction petition on any proper ground. *People v. Quigley*, 365 Ill. App. 3d 617, 619 (2006) (although the trial court applied the wrong standard to defendant's first-stage postconviction claim, the dismissal was affirmed because defendant conceded that his petition did not present the gist of a claim). As explained in *Quigley*:

> "[W]hen a summary dismissal is substantively erroneous, it is merely erroneous; thus, we may affirm it on a different substantive ground. However, when a summary dismissal is procedurally erroneous, *** it is not merely erroneous but rather is void. As a void judgment is one that the trial court has no power to enter [citation], we see no way that such a judgment could be one that the appellate court has the power to affirm." *Id*. at 620.

¶ 38    Most importantly for our review, since there is no procedural claim of error in the summary dismissal of defendant's petition (only the substantive ground for the use of the wrong standard), and the State has provided a substantive alternative basis to affirm, we will review this dismissal to determine whether applying the proper standard in the first instance would justify the summary dismissal. *Id.*

¶ 39                          C. Allegations Rebutted by the Record

¶ 40    The State argues that the affidavits are not of such a character that it would probably change the result on retrial. The State points to the following evidence introduced at trial: (1) Dr. Denton's conclusion that D.C. died of blunt force trauma to the head and abdomen, and injuries caused by acceleration and deceleration of the head, (2) the fact there was no evidence D.C. died from choking, (3) defendant admitted that he was home alone when D.C. became unresponsive, (4) that defendant alone was involved in punishing D.C. with cleaning up dog feces, and (5) defendant's admission that he ran into the bathroom and tossed D.C. into the bathtub, causing her to strike her head.

¶ 41    Defendant contends that the newly discovered evidence shows that his brother was in the home watching D.C. while he slept, and that he admits that he was responsible for punishing her. This, he argues, completely places the trial evidence in a different light and undermines the confidence in the judgment.

¶ 42    As already noted, a *pro se* postconviction petition is frivolous or patently without merit only if it "has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 16. A petition lacking an arguable basis in law or fact is one "based on an indisputably meritless legal theory or a fanciful factual allegation," such as one that is completely contradicted by the record. *Id.* Only allegations in the petition and supporting affidavits that are not positively rebutted by the record

- 12 -

are to be taken as true. *Robinson*, 2020 IL 123849, ¶ 45. *Robinson* provides guidance for understanding what it means for the evidence at trial to "positively rebut" new evidence in support of actual innocence. "For new evidence to be positively rebutted, it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Id*. ¶ 60.

¶ 43    Our review calls attention to the obvious; namely that defendant never renounced his statements to the police. For example, he does not suggest that the statements are fabrications or that he was forced to make them. More importantly, nowhere in Ricky's affidavit did Ricky actually inculpate himself. There is no admission that Ricky struck or threw D.C. to cause the injuries to her brain or abdomen or, for that matter, that someone else did it. Ricky did not even claim to have been present when D.C. became unresponsive.

¶ 44    While we are to consider all well-pled facts as true, Ricky's affidavit is positively rebutted by the record because defendant spoke with police and gave his statements well before he was considered a suspect or before being arrested. Further, it is quite apparent that defendant's statements at trial not only conflict with Ricky's affidavit, but also they positively rebut Ricky's affidavit with facts corroborated by the expert testimony. We therefore conclude that the record definitively rebuts defendant's postconviction claims, and the trial court did not err in dismissing defendant's petition at the first stage.

¶ 45                    D. Newly Discovered Evidence

¶ 46    Even if defendant's evidence were not rebutted by the record, his actual innocence claim was properly dismissed. As discussed earlier, to set forth a colorable claim of actual innocence, the supporting evidence must be "newly discovered." *Robinson*, 2020 IL 123849, ¶ 42 (citing *People v. Edwards*, 2012 IL 111711, ¶ 32). To constitute newly discovered evidence, the

evidence must have been unavailable at the original trial and evidence that could not have been discovered sooner through diligence. *People v. Anderson*, 402 Ill. App. 3d 1017, 1028 (2010).

¶ 47 Defendant averred in his affidavit that he knew Ricky had spoken with the detectives several times and "was pointing the finger at me." Besides, Ricky's affidavit lacks any allegation that he would have come forward earlier on defendant's behalf but for his own exposure. Even more, accepting the affidavits as true and construing the affidavits in favor of defendant, as we must, we find nothing in the record to suggest Ricky was unavailable or that he could not have been compelled to testify to the statements in his affidavit sooner. Ricky's affidavit undoubtedly asserts that defendant knew that Ricky was at the residence when D.C. became unresponsive, and defendant could have subpoenaed Ricky to offer evidence in his trial. Ricky's affidavit further does not describe facts or circumstances that have arisen or changed that would now make him willing to testify to what he purportedly did and observed on the afternoon of the incident. Thus, it is indisputable from this record that defendant was aware of his brother's existence as a potential witness at his trial, and defendant could have discovered this evidence before his trial. See *People v. Harris*, 206 Ill. 2d 293 (2002) (affidavits of the defendant's brothers were not newly discovered when the defendant was with his brothers during the alleged shooting); see also *People v. Davis*, 382 Ill. App. 3d 701 (2008) (affidavit of eyewitness to the defendant's arrest was not newly discovered evidence).

¶ 48 E. Material and Noncumulative

¶ 49 We also conclude that Ricky's affidavit is not arguably material. "Material means the evidence is relevant and probative of the petitioner's innocence." *People v. Coleman*, 2013 IL 113307, ¶ 96. Ricky's affidavit is not probative of defendant's innocence because he does not absolve defendant as the cause of D.C.'s injuries, nor does he claim to have caused D.C.'s injuries

himself. Ricky averring that he gave D.C. the jalapenos and hot sauce does not refute the overwhelming evidence in the trial, and taken as true, it is not at all probative of D.C.'s cause of death. Instead, the affidavit is merely a benign gesture of support, devoid of any evidence relevant to defendant's innocence. Consequently, the affidavit taken as evidence does not address the ultimate issue in the case concerning defendant's guilt. See *People v. Molstad*, 101 Ill. 2d 128, 135 (1984). Accordingly, we find that the statements in Ricky's affidavit are not arguably material or noncumulative.

¶ 50                              F. Likely to Change the Result on Retrial

¶ 51          Last, the State argues Ricky's affidavit is not of such conclusive character as to likely change the result of a retrial. For one, any testimony from Ricky that reasserted his affidavit would be impeached by defendant's statements given to law enforcement officers where (1) defendant stated he was alone in the home watching D.C. and (2) that defendant was the one who forced D.C. to pick up the dog's feces as punishment.

¶ 52          The State further argues that, likewise, the petition has no arguable basis in law because the evidence in Ricky's affidavit has no potential to exonerate defendant. See *Edwards*, 2012 IL 111711, ¶ 40 (where newly discovered evidence does little to exonerate the defendant, "it does not raise the probability that, in the light of the new evidence, it is more likely than not that no reasonable juror would have convicted petitioner").

¶ 53          We note the conclusive character of the new evidence is the crucial element of an actual innocence claim. *Robinson*, 2020 IL 123849, ¶ 47. The conclusive character of newly discovered evidence means the evidence, when considered along with the trial evidence, would probably lead to a different result. *Coleman*, 2013 IL 113307, ¶ 96. Essentially, to obtain relief under a claim of actual innocence, the defendant must present evidence so conclusive it would

probably change the result on retrial. *People v. Jones*, 26 Ill. App. 3d 78, 82 (1975). Our supreme court has held that, when determining if the evidence of actual innocence is conclusive, "the trial court then must consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Coleman*, 2013 IL 113307, ¶ 97. This approach "involves credibility determinations that are uniquely appropriate for trial judges to make." *Id.* That said, "the trial court should not redecide the defendant's guilt in deciding whether to grant relief." *Id.* Rather, "[p]robability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id.*

¶ 54    Defendant maintains that Ricky's affidavit satisfies the actual innocence requirements; that is, it is of such conclusive character that it would likely change the result on retrial. He contends that Ricky's affidavit is essentially his admission to being responsible for the injuries to D.C., clearly undermining confidence in this trial court's verdict of guilt. We do not agree.

¶ 55    In addition to the compelling medical evidence, the State provided evidence of defendant's statements, which were videotaped, and which the trial court had an opportunity to observe. This court has also reviewed the videotaped statements, which provided persuasive evidence of defendant's guilt. *People v. Patterson*, 154 Ill. 2d 414, 436 (1992) ("a confession may be the most probative and damaging evidence that can be admitted against a defendant" (internal quotation marks omitted)).

¶ 56    In those video statements, defendant described in detail the events of that morning, which corroborated the account provided by Dr. Denton in one significant respect. Defendant told how he tossed D.C into the bathtub, causing her to strike her head, which matched the location of

her skull fracture. On this "conclusive character" issue, we find our supreme court's decision in *Harris*, 206 Ill. 2d at 299-300, instructive. There, our supreme court considered whether the circuit court properly dismissed a defendant's first and second amended postconviction petitions, in which the defendant claimed that he was actually innocent based, in part, on the affidavits of two codefendants who stated that the defendant was not present at the time of the crime and that they conspired to frame the defendant. *Id.* Our supreme court affirmed the circuit court's decision to dismiss this claim without an evidentiary hearing, stating that "[b]ased upon the overwhelming evidence of guilt, the affidavits of [the codefendants] are not of such a conclusive character that they would probably change the outcome on retrial." *Id.* at 302.

¶ 57 Ricky's affidavit evidence is neither relevant nor probative of defendant's innocence, nor, if offered, would it likely lead to a different result at trial. At best, Ricky's affidavit would merely conflict with defendant's statements, but it would not arguably change the outcome on retrial, as required for a claim of "actual innocence." See *People v. Collier*, 387 Ill. App. 3d 630, 636-37 (2008), *overruled on other grounds by Robinson*, 2020 IL 123849 (where evidence merely impeaches or contradicts trial testimony, it is not typically of such conclusive character as to justify postconviction relief). Notably, Ricky's affidavit also fails to set forth any details of the actual crime, including any reference to D.C.'s condition or response to eating jalapenos and drinking hot sauce, as well as failing to admit any responsibility for D.C.'s death. Thus, it lacks any conclusive character that would likely change the result on remand.

¶ 58 Based upon the foregoing considerations, we find that the defendant's postconviction petition failed to state a colorable claim of actual innocence because the affidavit was not "of such conclusive character that it would probably change the result on retrial"

(*Edwards*, 2012 IL 111711, ¶ 32), where the affidavit contained only impeachment evidence. See *People v. Harper*, 2013 IL App (1st) 102181, ¶ 49.

¶ 59       Accordingly, we affirm the trial court's dismissal of defendant's petition as frivolous and patently without merit.

¶ 60                                III. CONCLUSION

¶ 61       For the reasons stated, we affirm the McLean County circuit court's judgment.

¶ 62       Affirmed.