NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 241326-U

NO. 4-24-1326

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 23, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| MOHAMED A. DIDA, | ) | No. 21CF953 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | J. Casey Costigan, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Presiding Justice Steigmann and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court granted the Office of the State Appellate Defender's motion to withdraw as counsel and affirmed the trial court's judgment, as no issue of arguable merit could be raised on appeal.

¶ 2    Defendant, Mohamed A. Dida, appeals from the trial court's dismissal of his postconviction petition filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2024)). The Office of the State Appellate Defender (OSAD) was appointed to represent defendant and now moves to withdraw, as defendant's appeal presents no potentially meritorious issues for review. We grant OSAD's motion and affirm the trial court's judgment.

¶ 3                                I. BACKGROUND

¶ 4    In September 2021, the State charged defendant, by information, with two counts of stalking. Count I alleged defendant knowingly engaged in nonconsensual contact with the victim, Shannon S., that reasonably caused her to fear for her safety or another's safety (720

ILCS 5/12-7.3(a)(1) (West 2020)). Count II alleged defendant knowingly engaged in nonconsensual contact with the victim that reasonably caused her to suffer emotional distress (*id.* § 12-7.3(a)(2)). In both counts, the State alleged defendant repeatedly followed the victim, approaching her at her residence and workplace from September 10, 2021, to September 13, 2021. A grand jury later indicted defendant on the same counts.

¶ 5        Defendant was released from pretrial custody in September 2021 after posting bond. His release was conditioned upon having no contact with the victim. However, between October and November 2021, defendant was alleged to have contacted the victim more than 120 times.

¶ 6        In November 2021, the State filed a motion to hold defendant without bail or increase the bond amount based on defendant violating the condition of no contact. The trial court increased defendant's bond, on the State's motion, from $50,000 to $500,000. In December 2021, defense counsel filed a motion to reduce defendant's bond, which the court denied.

¶ 7        In January 2022, defendant informed his appointed counsel he wished to proceed *pro se*. The trial court granted defendant's request after admonishing him of the consequences of representing himself, including the impact on claiming ineffective assistance in a future appeal:

> "You understand that if you are allowed to proceed *pro se*, meaning represent yourself, and there is an adverse verdict to you, and you go up on appeal with regard to that adverse verdict, you will not be allowed to complain about the competency of your counsel because you will be your counsel; do you understand that?"

Defendant acknowledged he understood the court's admonishments.

¶ 8        The case proceeded to a bench trial. The following evidence was adduced at trial.

¶ 9 Shannon and defendant were introduced by a mutual friend and wed in an Islamic religious ceremony but were never legally married. Shannon had a young child from a prior relationship. In July 2021, Shannon and defendant separated, and she informed defendant she no longer desired to reconcile. She asked him to stop contacting her. Shannon stopped responding to e-mails from defendant, but defendant continued to send e-mails, sometimes sending multiple messages a day.

¶ 10 On September 10, 2021, while Shannon was working an overnight shift, she looked outside and saw defendant cleaning out her car. Shannon had left her keys in the car "as a bad habit." Shannon went out to her car and found defendant sitting in her car. Defendant hugged and kissed Shannon and asked for a key to her house so he could sleep on her couch. Shannon told defendant to leave immediately and warned him there were "cameras everywhere." When defendant would not leave, Shannon told him she needed to go back into the building for a work emergency. Once Shannon was far enough away, she told defendant she was not coming back out and that he needed to leave immediately.

¶ 11 Defendant went back to his van, parked next to Shannon's car, and went to sleep. As a safety precaution, Shannon's coworker moved the car to another parking lot. Defendant moved his vehicle near Shannon's car. After finishing her morning shift, Shannon got a ride home and picked up her car later that evening. When she retrieved her car, defendant's van was still nearby. Shannon took her car to get gas and spoke to a deputy who was at the gas station. The deputy wanted to take a report right then, but Shannon declined. The deputy advised her to complete a report as soon as possible.

¶ 12 On September 12, 2021, Shannon received numerous e-mails from defendant throughout the morning, afternoon, and evening. Surveillance videos at Shannon's apartment

complex captured defendant entering the building around 3:30 a.m. Shannon was awakened by defendant beating on her apartment door so hard "it felt like the hinges were going to come off." Shannon's daughter was "completely terrified and would not go back to sleep." Later that morning, defendant was waiting by Shannon's car when she was leaving with her daughter to go to their mosque. Defendant tried to get into Shannon's car, asking where they were going. Shannon locked the doors and drove away. Defendant followed Shannon in his van to a drive-through line, where he yelled at her to order him food. Shannon ordered him food, hoping it would slow him down, but defendant still followed her "all the way to the mosque."

¶ 13        At the mosque, surveillance video captured defendant walking over to the driver's side of Shannon's vehicle. Defendant kept insisting Shannon get out of her car, talk to him, and go with him into the mosque. Shannon refused and did not leave her car with her daughter until defendant left them to make a phone call. Because more people had arrived, Shannon and her daughter went inside. In the mosque, defendant found Shannon in a classroom, where she was teaching pre-K children, pulled up a chair, sat right behind her, and whispered, "[J]ust let me talk to you." The principal, who was aware of the situation, came into the classroom and gave snacks to the children while Shannon took defendant outside the classroom and told him to leave. That afternoon, Shannon waited until defendant was no longer in the parking lot before leaving.

¶ 14        On September 13, 2021, after having been at Shannon's apartment and not finding her home, defendant bombarded her with repeated e-mails. Shannon responded to tell him she was not at home or at work and that she was "done." Shannon told defendant she was "truly done" and he had to stop immediately. However, defendant did not stop, sending more e-mails in quick succession, pleading with her to give him a chance. That evening, when Shannon arrived at work for her overnight shift, defendant was waiting for her. Defendant begged Shannon to take

him back. Prior to her arrival, defendant had been showing pictures of Shannon to individuals in the parking lot and asking if they had seen her. He also called her work multiple times, inquiring when her shift started. In light of defendant's suspicious activity, the police were called and Officer Elizabeth Hedges arrived on the scene. Hedges walked Shannon into work and then approached defendant in his van. Hedges told defendant she wanted to speak with him. Defendant yelled, "[T]hat's my wife," backed down the driveway, and drove off erratically. Hedges later spoke with a visibly shaken Shannon, who gave a detailed statement to police the next day.

¶ 15        Shannon testified, from the duration of September 10, 2021, when defendant showed up in town, to September 13, 2021, when she confided in police, she was beyond "afraid." Shannon explained, "Afraid was an understatement. I was scared for my and my daughter's life." She prayed defendant's behavior would stop, but each day it escalated and worsened.

¶ 16        Defendant cross-examined the State's witnesses and testified in his defense. At the conclusion of the bench trial, after considering the testimony, exhibits, and arguments, the trial court found defendant guilty of both counts, stating:

> "Based upon the totality of the evidence, I am absolutely convinced that [the State has proven its case]. This evidence convinces me beyond a reasonable doubt that the Defendant knowingly engaged in a course of conduct directed at Shannon ***, that he knew or should have known would cause a reasonable person to fear for her safety *and* cause her to suffer emotional distress." (Emphasis added.)

¶ 17        At sentencing, defendant was represented by private counsel. The two counts

were merged and defendant was sentenced to two years' imprisonment. Defendant filed a timely notice of appeal. However, after defendant chose to proceed *pro se* on appeal and failed to file an appellant's brief, his direct appeal was ultimately dismissed on this court's order.

¶ 18 In July 2024, defendant filed a *pro se* petition under the Act, asserting (1) the State did not prove he committed a crime and incarcerated him for political purposes; (2) his public defender provided ineffective assistance by (a) failing to respond promptly to his requests, (b) reviewing news articles detailing defendant's political career, (c) exaggerating the charges against him, and (d) assisting the State in raising his bond; and (3) errors by the Illinois Department of Corrections (DOC) in calculating his sentence. Relevant to defendant's sentencing claim, in McLean County case No. 21-CF-1216, defendant was also convicted of aggravated stalking and sentenced to a consecutive term of five years' imprisonment, to be served consecutively to his sentence in the instant case. This court affirmed defendant's conviction and sentence in case No. 21-CF-1216. *People v. Dida*, 2025 IL App (4th) 231371-U, ¶ 54.

¶ 19 The trial court dismissed defendant's postconviction petition at the first stage as frivolous and patently without merit. In relevant part, the court explained:

"In the current case it is difficult to ascertain what [Defendant] is alleging is a Constitutional violation. He alleges the Chief Judge took the case and made it a misdemeanor and the Public Defender thereafter took and exaggerated the case to three felonies. The allegations are not supported by the record.

[Defendant] asserts he is serving two consecutive sentences which he claims is wrong and he in turn is serving 8 additional years. Again, this is not supported by the record.

[Defendant] has attached his [DOC] paperwork but fails to allege what error is contained in the paperwork. [DOC] calculated a 2-year sentence followed by a 5-year sentence.

[Defendant's] affidavit further makes allegations that he did not commit a crime and he is being incarcerated for political purposes. This allegation is not supported by the record.

***

The Petition which [Defendant] has filed does not clearly set forth the respects in which his constitutional rights were violated. The allegations made by [Defendant] are frivolous, patently without merit and are not supported in law or fact. Therefore, the Petition is dismissed."

¶ 20 Defendant appealed the trial court's dismissal of his postconviction petition. OSAD was appointed to represent defendant on appeal and has moved to withdraw as counsel. Defendant was granted leave to file a response to OSAD's motion and has not done so.

¶ 21 II. ANALYSIS

¶ 22 On appeal, OSAD moves to withdraw as appellate counsel, concluding an appeal in this case would be without arguable merit. We agree.

¶ 23 The Act provides a means by which criminal defendants can assert their convictions were the result of a substantial denial of their rights under the federal or state constitutions. *People v. Guerrero*, 2012 IL 112020, ¶ 14. The Act establishes a three-stage process for adjudicating a postconviction petition. *People v. English*, 2013 IL 112890, ¶ 23. At the first stage, the trial court must independently review the petition and determine whether "the

petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2022). A postconviction petition is frivolous or patently without merit when it "has no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009). "A petition which lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless legal theory or a fanciful factual allegation." *Id.* at 16. "The allegations of the petition, taken as true and liberally construed, need only present the gist of a constitutional claim." *People v. Brown*, 236 Ill. 2d 175, 184 (2010). "This standard presents a 'low threshold' [citation], requiring only that the petitioner plead sufficient facts to assert an arguably constitutional claim." *Id.* A trial court's dismissal of a postconviction petition is reviewed *de novo*. *People v. Gharrett*, 2022 IL App (4th) 210349, ¶ 30.

¶ 24                              A. Defendant's Conviction

¶ 25            OSAD argues no meritorious argument can be raised in relation to defendant's claims he was improperly convicted and incarcerated for political reasons because the State's evidence at trial was sufficient to support defendant's conviction for stalking on both charged counts.

¶ 26            To sustain a conviction for stalking under section 12-7.3(a)(1) of the Code of Criminal Procedure of 1963 (Code) (720 ILCS 5/12-7.3(a)(1) (West 2020)), the State must prove the defendant "knowingly engage[d] in a course of conduct directed at a specific person *** [that] would cause a reasonable person to *** fear for his or her safety or the safety of a third person." To sustain a conviction for stalking under section 12-7.3(a)(2) of the Code (*id.* § 12-7.3(a)(2)), the State must prove the defendant "knowingly engage[d] in a course of conduct directed at a specific person *** [that] would cause a reasonable person to *** suffer other emotional distress." Our standard for reviewing a challenge to the sufficiency of the evidence is

" 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 27      Here, sufficient evidence was presented from which a rational trier of fact could determine beyond a reasonable doubt defendant knowingly engaged in a course of conduct directed at Shannon that reasonably caused her to (1) fear for her safety and (2) suffer emotional distress.

¶ 28      After attempting to permanently end her relationship with defendant, Shannon told him not to contact her, but he relentlessly continued to do so. The evidence elicited at trial showed defendant showed up at Shannon's workplace, sat in Shannon's car, and grabbed Shannon to kiss her. After Shannon told him to leave immediately, defendant parked next to her car and went to sleep. Defendant later moved his vehicle next to Shannon's car.

¶ 29      Defendant also arrived at Shannon's apartment building in the early morning hours and knocked loudly on her door. Shannon's daughter was "completely terrified." Defendant later followed Shannon to her mosque and into her classroom and sat behind her.

¶ 30      Thereafter, defendant approached Shannon again outside her workplace and begged her to take him back. Officer Hedges testified Shannon was visibly "shaken up" following the encounter with defendant.

¶ 31      Shannon testified defendant's conduct from September 10, 2021, to September 13, 2021, made her "scared for [her life] and [her] daughter's life." Officer Hedges testified about one of her encounters with Shannon and how she witnessed Shannon's hands shaking and observing signs that she was very fearful. The evidence further showed Shannon repeatedly

asked defendant to stop contacting her, but defendant ignored her pleas. The trial court noted defendant's conduct was so concerning that it "would absolutely cause a reasonable person to fear for their safety and cause emotional distress."

¶ 32   We find the evidence of defendant's constant e-mail communications, unwanted physical encounters, and following of Shannon overwhelmingly supports his conviction. We agree with OSAD that no meritorious argument can be raised on appeal defendant was improperly convicted.

¶ 33                          B. Ineffective Assistance of Counsel

¶ 34   As OSAD notes, defendant proceeded *pro se* at trial, and therefore, his allegations of ineffective assistance solely concern his pretrial counsel. OSAD asserts there is no colorable argument for defendant's allegations his pretrial counsel (1) failed to respond promptly to his requests, (2) reviewed news articles about his political career, (3) exaggerated the charges against him, and (4) assisted the State to raise his bond.

¶ 35   Ineffective assistance of counsel claims must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010). A defendant's failure to establish either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *People v. Poole*, 2022 IL App (4th) 210347, ¶ 73. "At the first stage of postconviction proceedings under the Act, a petition alleging ineffective assistance may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Hodges*, 234 Ill. 2d at 17.

¶ 36   First, defendant's petition alleged his pretrial counsel "refused to talk/visit [him]

for 3 months despite requests and calls from prison staff." The record shows in 2021, defendant requested to speak to counsel through inmate request forms on November 29, December 28, and December 29, 2021. However, defendant indicated his desire to proceed *pro se* on January 5, 2022. Pretrial counsel spoke with defendant on multiple occasions, confirming defendant's desire to proceed *pro se* before the trial court explained the consequences of proceeding *pro se*. After ensuring defendant's waiver of counsel was knowing, intelligent, and voluntary, the court granted defendant's request. Defendant has not demonstrated how further communication with counsel would have altered the outcome at trial. See *People v. Valladares*, 2013 IL App (1st) 112010, ¶ 64 (finding no ineffective assistance where the record showed communication between the defendant and his trial counsel, and the defendant did "not explain[ ] how additional pretrial communication with [counsel] would have altered the outcome of his case"). Counsel discussed defendant's decision to proceed *pro se* shortly after his requests for communication, and defendant represented himself after that point. There is no reasonable argument to be made defendant was prejudiced by counsel's alleged failure to respond to his requests for communication.

¶ 37    Second, defendant's petition alleged pretrial counsel was ineffective for reviewing news articles about his political career. It is unclear how pretrial counsel could have acted below an objective standard of reasonableness by being aware of his client's identity. Furthermore, defendant himself introduced information about his political ambitions on the record. No reason exists to assume counsel's act of reviewing news articles was arguably unreasonable or prejudicial to defendant.

¶ 38    Finally, defendant's petition alleged pretrial counsel was ineffective for exaggerating his case from a misdemeanor charge into three felonies and assisting the State in

raising his bond. Contrary to defendant's allegations, there is no evidence to suggest defense counsel assisted the State in convicting defendant or increasing his bond. Defendant was first charged by information with two counts of Class 4 felony stalking. Those charges were superseded in September 2021 by grand jury indictment of two counts of Class 4 felony stalking. Nothing in the record suggests defendant was ever charged with a misdemeanor, much less a misdemeanor superseded by three felony charges. As to defendant's bond, one of the conditions of his bond was to have no contact with Shannon. Although there was a no-contact provision and an order of protection in place, defendant still continued to contact Shannon. As a result, the State filed a petition to increase defendant's bond. There is nothing in the record to suggest pretrial counsel was involved in increasing defendant's bond. In fact, pretrial counsel filed a motion to reduce defendant's bond, alleging it was excessive. The trial court denied that motion due to pertinent concerns for the victim's safety.

¶ 39      As demonstrated, the aforementioned claims are meritless. Defendant has not shown any arguable prejudice with respect to any of his claims and, therefore, he cannot show counsel was ineffective. See *People v. Gray*, 2012 IL App (4th) 110455, ¶ 48 ("Because both elements of *Strickland* are essential, a court may proceed directly to the question of prejudice, without considering whether defense counsel's performance fell below professional standards."). We agree with OSAD that no meritorious ineffective assistance of counsel argument can be raised on appeal.

¶ 40                                    C. Sentencing

¶ 41      OSAD argues defendant's allegation that DOC improperly calculated his sentence does not raise the gist of a constitutional claim and, therefore, no meritorious sentencing argument can be raised on appeal.

¶ 42     Defendant was sentenced to two years in this case and five years for aggravated stalking offense McLean County case No. 21-CF-1216. DOC's sentence calculation worksheet attached to his petition showed a two-year sentence followed by a five-year sentence, for an aggregate term of seven years. Defendant alleged in his petition that DOC improperly calculated his sentence by adding eight years to the calculation and making him serve his sentence twice. This allegation was not reflected by the calculation sheet or the record. As the trial court noted, defendant failed to allege any sentencing error that raised the gist of a constitutional claim. Defendant made no claims of error regarding his original sentence or the sentencing hearing. We agree with OSAD that no meritorious sentencing argument can be raised on appeal.

¶ 43                          III. CONCLUSION

¶ 44     For the reasons stated, we grant OSAD's motion for leave to withdraw as counsel and affirm the trial court's judgment.

¶ 45     Affirmed.