2023 IL App (1st) 221070-U

No. 1-22-1070

Order filed November 13, 2023

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 96 CR 10016 |
| COREY CONICK, | ) ) | Honorable Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The second-stage dismissal of defendant's third successive postconviction petition is affirmed over his contention that postconviction counsel provided unreasonable assistance.

¶ 2    Defendant Corey Conick, who pled guilty to first degree murder and attempted armed robbery in exchange for consecutive sentences of 60 and 10 years in prison, appeals from an order of the circuit court granting the State's motion to dismiss his third successive petition for relief

filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)).[1] On appeal, defendant contends that his postconviction counsel provided unreasonable assistance by failing to amend the third successive petition to include a claim of actual innocence, support the claim with an affidavit from an anticipated trial witness in which the witness recanted testimony he had given at defendant's mistrial, and frame the claim as ineffective assistance of prior appellate counsel for failing to argue the issue on appeal from the denial of leave to file his second successive petition. For the reasons that follow, we affirm.

¶ 3    Defendant's conviction arose from the January 15, 1996, shooting death of Frank Randle, a livery driver who had been dispatched to an address on the 4400 block of West Adams Street. Following arrest, defendant, who was 19 years old, was charged by indictment with six counts of first degree murder, two counts of armed violence, and one count each of burglary, attempted armed robbery, attempted robbery, and aggravated unlawful restraint.

¶ 4    Prior to trial, defendant filed a motion to suppress statements, alleging brutal and coercive interrogation tactics on the part of police officers and an assistant state's attorney. An entry on the trial court's half-sheet reflects that the motion to suppress statements was heard and denied on October 30, 1996. The record on appeal does not include a transcript of the hearing.

¶ 5    A jury trial commenced on April 11, 1997. Relevant here, at trial, Arthur Love testified that he was acquainted with defendant because defendant lived next door to his friend on the 4400 block of West Adams Street. Love learned about Randle's shooting in the newspaper. A couple of days later, Love saw defendant in that neighborhood and asked him if he knew anything about the

---

[1] We utilize the spelling of defendant's name as it appears on the notice of appeal.

shooting. Defendant looked at Love, smiled, laughed, and said, "[H]uh." When asked to clarify defendant's utterance, Love explained that defendant did not use any actual words.

¶ 6 Love further testified that a couple of days after that, he was back in the neighborhood and saw defendant again. He asked defendant whether he had killed "the cab driver." Defendant answered, "Yeah, I did it," and asked if "they" could trace his address, as "he had used the address two doors from him." Defendant also asked Love whether "they" could trace his phone. Defendant told Love that he did "this" because he was broke and needed money. On cross-examination, Love admitted that he did not volunteer any information to the police. Rather, the police left a card at his house in March 1996, after which he went to the police station for five or six hours. Love also acknowledged that he had been convicted of theft in 1988.

¶ 7 After two other State witnesses gave allegedly improper and prejudicial testimony, defendant moved for a mistrial. The trial court granted defendant's motion on those grounds, but denied defendant's subsequent motion to dismiss the indictment and bar re-prosecution based on double jeopardy principles. Defendant filed an interlocutory appeal. We affirmed. *People v. Conick*, No. 1-97-1701 (1998) (unpublished order under Illinois Supreme Court Rule 23).

¶ 8 On August 31, 1998, defendant entered into a negotiated plea agreement in which he pled guilty to one count each of first degree murder (count I) and attempted armed robbery (count X) in exchange for consecutive sentences of 60 and 10 years in prison, respectively. The State set forth a factual basis for the plea based on the anticipated testimony of Randle's wife, the livery dispatcher, an Ameritech record keeper, a detective, an assistant state's attorney, and a medical examiner.

¶ 9 Patricia Young Randle would have testified that on January 15, 1996, Randle left their home about 5 p.m. to go to work as a cab driver. Tasha Arnold, the livery company dispatcher, would have testified that at about 8:45 p.m., she received a call to dispatch a driver to a particular address on the 4400 block of West Adams Street. The call was for "a single male black individual to be taken to the 3200 block of Maplewood." Arnold dispatched the call to Randle. He responded that he would take the call and, a few minutes later, radioed that he had arrived at the address. Rene Patrick, or any other record keeper from Ameritech, would have testified that Ameritech's business records indicated the livery company received a phone call at 8:47 p.m. from an Ameritech subscriber, Lula Conick, with an address on the 4400 block of West Adams Street.

¶ 10 Chicago police detective Thomas Flaherty would have testified that he obtained the phone records and other records and became aware that Lula Conick had one son, namely, defendant, who was over the age of 13. Flaherty obtained a photo of defendant and began to look for him. On March 21, 1996, police officers located defendant walking down the street in the 4400 block of West Adams Street. Defendant agreed to accompany them to the station and stay overnight to submit to another interview the next morning.

¶ 11 Assistant State's Attorney Dan Weiss would have testified that on March 22, 1996, he introduced himself to defendant, advised him of his *Miranda* rights, and interviewed him. Defendant chose to give a handwritten statement rather than an oral or court-reported statement. In court, Weiss would have identified the handwritten statement, which was signed by himself, a detective, and defendant. In the statement, defendant related that on January 15, 1996, he wanted to get high and "snort some reefer," but did not have any money. Consequently, he decided to call for a cab driver to rob. He called from the house of his mother, Lula Conick. When the driver,

Randle, arrived, defendant entered the front passenger seat, produced a .25-caliber semi-automatic weapon, and demanded money. Randle placed his foot on the accelerator and began driving away. Defendant fired a shot at Randle's chest. When Randle continued to attempt to drive away, defendant fired a second shot at him. Finally, because Randle refused to stop, defendant jumped out of the cab as it continued down Kilbourn Avenue.

¶ 12    The medical examiner who conducted Randle's autopsy would have testified that he suffered two gunshot wounds: one that entered his chest and traveled through his heart; and one that entered the right side of his head and left a bullet lodged in his brain. The medical examiner observed evidence of close-range firing in the shot to the head. She determined that Randle died from multiple gunshot wounds and the manner of death was homicide.

¶ 13    After defense counsel stipulated to the testimony, the trial court found that a factual basis existed for the plea and entered guilty findings as to the charges of first degree murder (count I) and attempted armed robbery (count X). The court imposed the agreed-upon consecutive sentences of 60 and 10 years in prison, and the State moved to nol-pros the remaining counts. Finally, the court admonished defendant of his appellate rights, explaining, among other things, that he would have to file a motion to withdraw his plea within 30 days prior to taking an appeal.

¶ 14    Three days later, defendant, through counsel, filed a motion to reconsider and reduce sentence. On September 8, 1998, the trial court "denied" the motion, explaining that it only had jurisdiction to entertain a motion to withdraw the guilty plea and vacate judgment. It does not appear from the record that defendant ever filed a motion to withdraw his plea or attempted to file a direct appeal.

¶ 15    In 1999, defendant filed his first *pro se* petition for postconviction relief under the Act. In the petition, he alleged that trial counsel misled him by stating he would receive a 35-year sentence in exchange for pleading guilty. He further alleged that after sentencing, when a 70-year aggregate sentence was imposed, he asked trial counsel to file a motion to vacate his guilty plea. According to defendant, counsel stated he would do so. Defendant asserted that, had he known he was going to receive a 70-year sentence in exchange for a plea, he would have opted instead for a jury trial.

¶ 16    The circuit court advanced the petition to second-stage proceedings and appointed counsel. Counsel thereafter filed an amended petition, elaborating on defendant's claims that his trial counsel was ineffective for misleading him regarding the length of the sentence he would receive for pleading guilty and not filing a motion to withdraw the plea upon his request. Counsel also asserted that, due to counsel's ineffectiveness, defendant's plea was involuntary. The State did not move to dismiss but, rather, filed an answer.

¶ 17    Following a third-stage evidentiary hearing, the circuit court denied defendant's petition. The court found that trial counsel was credible, that defendant had not been misled as to his sentence, and that defendant suffered no prejudice from counsel's failure to file a motion to withdraw the plea, as such a motion would have been denied. Defendant thereafter filed a motion to reconsider, which the circuit court denied, and a timely notice of appeal. This court, on its own motion, subsequently dismissed the appeal for want of prosecution. *People v. Conick*, No. 1-99-3688 (July 18, 2000) (unpublished disposition order).

¶ 18    In December 2000, defendant filed a *pro se* petition seeking relief under the Act and section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2000)). In the petition, defendant asserted, based on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), that his consecutive sentences

were unconstitutional and void. The circuit court, characterizing the petition solely as a postconviction petition brought under the Act, summarily dismissed the successive petition as frivolous and patently without merit. We affirmed. *People v. Conick*, No. 1-01-1077 (2003) (unpublished order under Illinois Supreme Court Rule 23).

¶ 19    On January 17, 2006, defendant filed a *pro se* motion for leave to file a second successive petition for postconviction relief under the Act. He introduced his motion as follows: "Now comes, the Petitioner, Corey Conick, pro se, and petitions this Honorable Court to grant him a new trial based on issues of newly discovered evidence, violations of his constitutional rights and claims of actual innocence." Defendant argued that the State knowingly used false and perjured testimony in order to obtain a conviction and that his trial attorney was ineffective for not adequately investigating claims that the police unlawfully seized him in violation of his constitutional rights.

¶ 20    Defendant asserted that he had met the cause and prejudice test for filing a successive petition. As to cause, he argued that "no due diligence on behalf of petitioner could have prevailed in bringing forth the issue of Arthur Love presenting an affidavit refuting his entire trial testimony at petitioner[']s trial." He explained he could not have presented Love's affidavit earlier, as he "had no control over this witness wanting to do the right thing." As to prejudice, defendant argued that the State knew Love's testimony was not truthful and allowed it to go uncorrected, and that "the knowing use of perjured testimony" reasonably "could affect a jury verdict." He claimed that the State knew that Love's statement "was the result of pressuring, coercion and ultimately intimidation that subsequently resulted in Mr. Love identifying petitioner as the culprit who had committed this crime," and that the State could not disassociate itself from the conduct of the police.

¶ 21    Defendant continued as follows:

"Petitioner believes he has also sati[s]fied the standard set forth as 'prejudice' where in presenting this affidavit from the state[']s sole witness Mr. Love it demonstrates that petitioner could have not received a fair trial where so many factors played a part in making him choose to take a plea, where he knew he was not guilty but since the evidence seemed overwhelming and the [S]tate continued to use this improper information as a tactic to ensure conviction, and petitioner[']s attorney[']s lack of representation petitioner was faced with no other recourse but to take a plea in order to spare his life from a possible sentence of death."

¶ 22    Defendant further asserted that his trial counsel was ineffective for failing to (1) investigate "issues of a 4th. Amendment violation"; (2) investigate the crime scene; (3) "seek out witnesses who could have refuted the claims in which police makes [*sic*] as far as identification"; and (4) interview any witnesses who were present when the police approached him and gave the appearance he was under arrest. In support of his third claim of ineffectiveness, defendant stated that "a witness" had identified "another person other than petitioner who she says she witnessed commit this crime." He explained that he did not have this witness's name because he had not been given a copy of his motion for discovery. Referring to Love, defendant also argued that the police had focused attention "on another suspect who would later not be charged, but would be the only person who directly indicates petitioner as the person who had committed this crime, but now that an affidavit has been provided by this sole witness the credibility of the officers is now an issue."

¶ 23    Defendant argued that he was "arrested" when he was taken to the police station, as he was restrained of his freedom of movement by a show of authority, and that the police induced him to

give an untruthful statement. He asserted that his trial counsel was ineffective for failing to "ask basic questions" regarding the circumstances of his initial stop and whether he was free to leave during his detention at the station, and for not impeaching the trial testimony of two officers who contradicted each other regarding whether the interview room's door was locked. Defendant maintained that due to counsel's ineffectiveness, his inculpatory statement was found to be voluntarily made and admissible.

¶ 24    Defendant maintained that he had met the cause and prejudice test for filing a successive petition in part "because this petition['s] claims of actual innocence are clear where the recantation of the [S]tate[']s sole witness has come forward indicating that he had not only lied during the initial investigation, but also during petitioner[']s trial." Defendant argued that "this information" was of such a convincing character that it would have most likely changed the outcome of the trial if known.

¶ 25    Defendant supported his petition with an affidavit from Love, in which Love stated that he testified falsely at defendant's trial and had since "been troubled" by his conscience, knowing he had helped send "an innocent man" to prison. Love averred that he learned of the shooting the night it happened and, the next day, the police visited him and asked if he had any knowledge of the crime. Love denied that he did, but "they continued to ask me questions as though I was a suspect in the crime, after a while they ended the questioning, but said that they would be back if my story didn't pan out." A few days later, Love heard that he "was being sought by the police in connection to the murder."

¶ 26    Love averred that in February 1996, he was "basically arrested." The police took him to a station and held him in a room for nearly a full day, repeatedly asking questions about Randle and

defendant. After the police learned Love had a drug problem and "sensed [he] was starting to hurt for some drugs," they coached him about defendant's involvement in the shooting. They told Love that, after they arrested defendant, he "would come to court and testify to all of the stuff they had just told me, or I would be arrested and charged with the cab driver[']s death, and that I would really be hurting from not being able to get high." After Love agreed to give a statement, he was released. Later, but prior to trial, he was visited by an officer who "wanted to be assured that I was still planning on testifying and I told him I would only because I was not trying to be arrested for a crime I did not commit."

¶ 27 Love explained that since trial, he had become drug-free. One step of his rehabilitation was accepting responsibility for his actions. As such, he wanted to correct his "action" at defendant's trial. He concluded:

"[I]f I wasn't forced and threatened by the police I would have never ever came into court and lied in the way that I did, but because I did I feel like I have an obligation to come forward with the truth and the truth is that Corey never confided in me about killing this cab driver, and all of what I testified to was in fact a lie induced by the fear in which the [police] placed in me, and if called as a witness in any future proceeding I would not hesitate to do so."

¶ 28 The circuit court entered two orders on February 23, 2006. In the first order, the court found that the proffered second successive postconviction petition failed to satisfy the cause and prejudice requirements for filing and deemed its claims "entirely lacking in merit."[2] The court

---

[2] The circuit court's order is not included in the record on appeal, but was described and quoted in *People v. Conick*, 232 Ill. 2d 132, 135 (2008).

therefore denied defendant leave to file. The circuit court's second order assessed fees and costs for a frivolous filing, stating that the petition "was frivolous and patently without merit." Defendant filed a *pro se* motion to reconsider, which the circuit court denied.

¶ 29    On appeal, defendant solely challenged the frivolous filing assessment. This court struck the assessment but otherwise affirmed. *People v. Conick*, No. 1-06-1375 (2007) (unpublished order under Illinois Supreme Court Rule 23). On further appeal, the Illinois Supreme Court reversed the vacatur of the assessment and affirmed the circuit court. *People v. Conick*, 232 Ill. 2d 132 (2008).

¶ 30    On July 10, 2020, defendant filed the pleading at issue in the instant appeal, a *pro se* motion for leave to file a third successive petition under the Act. He claimed that, where he was 19 years old when the murder occurred and the trial court failed to consider his youth and its attendant characteristics at sentencing, his 70-year sentence constituted an unconstitutional *de facto* life sentence under *Miller v. Alabama*, 567 U.S. 460 (2012), and *People v. Buffer*, 2019 IL 122327. Defendant asserted that he had met the cause and prejudice test for filing a successive petition. As to cause, he argued that *Miller* and *Buffer*, which provided the legal basis for his claim, were not available when he filed his previous petitions. As to prejudice, he simply asserted he was serving an unconstitutional *de facto* life sentence.

¶ 31    On November 9, 2020, the circuit court granted defendant leave to file his third successive petition and appointed the public defender to represent him. Counsel entered his appearance on December 21, 2020, and, on May 24, 2021, and September 8, 2021, informed the circuit court that he was waiting to file a certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) until the Illinois Supreme Court decided *People v. House*, 2021 IL 125124, which was issued on October 22, 2021. On December 7, 2021, counsel filed a Rule 651(c) certificate. In the

certificate, counsel stated he had consulted with defendant to ascertain his contentions of deprivation of constitutional rights; examined the record of proceedings, including the common law record, report of proceedings, and exhibits; and, after review and consultation with defendant, had determined that no amendments or supplements were necessary for an adequate presentation of defendant's contentions.

¶ 32    The State filed a motion to dismiss, arguing that defendant had not established cause or prejudice, as required to file a successive petition. Specifically, the State relied on *People v. Jones*, 2021 IL 126432, ¶¶ 27-28, which held that, because a trial court's decision whether to accept or reject a plea agreement necessarily constitutes an exercise of its discretion, *Miller* is inapplicable when a juvenile enters a negotiated plea agreement. "For the sake of argument," the State also asserted that *Miller* did not apply to defendant because he was not a juvenile offender.

¶ 33    On July 8, 2022, the circuit court heard and granted the State's motion to dismiss defendant's petition. At the hearing, postconviction counsel noted that *Jones* was decided after defendant filed his petition and urged the circuit court to follow that opinion's dissent. Counsel further argued that defendant's petition "is also claiming proportionate penalties." In response, the State pointed out that defendant had not made a proportionate penalties claim in his petition and asserted that, *arguendo*, "*Jones* would still control under proportionate penalties." The circuit court agreed with the State that *Miller* did not apply and *Jones* was controlling, and, therefore, "denied" defendant relief. Defendant filed a timely notice of appeal.

¶ 34    On appeal, defendant contends that postconviction counsel provided unreasonable assistance under Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) by failing to amend his third successive petition to present a claim of actual innocence, supported by Love's affidavit, and

frame the claim "as ineffective assistance of prior appellate counsel for failing to argue this issue on appeal from the denial of leave to file the [second successive] petition."

¶ 35    At the second stage of postconviction proceedings, appointment of counsel is a statutory, rather than constitutional, right. 725 ILCS 5/122-4 (West 2020); *People v. Suarez*, 224 Ill. 2d 37, 42 (2007). Under the Act, petitioners are entitled to a "reasonable" level of assistance of counsel. *People v. Perkins*, 229 Ill. 2d 34, 42 (2007). To ensure this level of assistance, Rule 651(c) imposes three duties on appointed postconviction counsel. *Id.* Pursuant to the rule, either the record or a certificate filed by the attorney must show that counsel (1) consulted with the petitioner to ascertain his contentions of constitutional deprivations, (2) examined the record of the trial proceedings, and (3) made any amendments to the filed *pro se* petitions necessary to adequately present the petitioner's contentions. Ill. S. Ct. R. 651(c) (eff. July 1, 2017); *Perkins*, 229 Ill. 2d at 42.

¶ 36    The filing of a Rule 651(c) certificate creates a rebuttable presumption that postconviction counsel provided reasonable assistance, and substantial compliance with the rule is sufficient. *People v. Profit*, 2012 IL App (1st) 101307, ¶ 19. A defendant bears the burden of overcoming the presumption of reasonable assistance by demonstrating his attorney's failure to substantially comply with the duties mandated by Rule 651(c). *Id.* Our review of an attorney's compliance with Rule 651(c), as well as the dismissal of a postconviction petition without an evidentiary hearing, is *de novo*. *Id.* ¶ 17. We may affirm the circuit court's dismissal of a postconviction petition on any basis shown in the record. *People v. Davis*, 382 Ill. App. 3d 701, 706 (2008).

¶ 37    Here, postconviction counsel filed a Rule 651(c) certificate. Therefore, a presumption exists that defendant received the representation required by the rule. *Id.* ¶ 19. That is, a

presumption exists that defendant received reasonable assistance of postconviction counsel. *People v. Hayes*, 2016 IL App (3d) 130769, ¶ 12.

¶ 38    Defendant contends that he has rebutted the presumption of compliance with Rule 651(c), arguing that postconviction counsel provided unreasonable assistance by failing to amend his 2020 petition to include a claim that prior appellate counsel was ineffective for failing to argue that his 2006 petition raised a meritorious claim of actual innocence.

¶ 39    Specifically, defendant argues that his 2006 petition presented a meritorious claim of actual innocence based on newly-discovered evidence in the form of Love's affidavit. Defendant maintains that where Rule 651(c) requires that counsel certify that he has made any amendments to the *pro se* "petitions" that are necessary for an adequate presentation of a petitioner's contentions, the Rule, by its plain language, refers to *all* previously-filed *pro se* petitions. By extension, he asserts, claims appearing in prior petitions must be presented in an amended petition if they are meritorious.

¶ 40    Defendant maintains that when postconviction counsel appointed on his 2020 petition reviewed the record, such review should have revealed that the 2006 petition contained a meritorious claim of actual innocence that was supported by Love's affidavit, found to be frivolous and patently without merit by the circuit court, and abandoned by appointed counsel on appeal. Defendant argues that when postconviction counsel became aware of that claim, counsel should have also realized it was improperly dismissed at the pleading stage, when Love's affidavit was required to have been accepted as true.

¶ 41    Defendant asserts that the actual innocence claim "had strong potential merit" where: it was supported by Love's affidavit; he pled guilty "in part because he expected Love to testify

again at a second trial and he feared being found guilty on the basis of that evidence and receiving the death penalty"; and Love's recantation "significantly changes the strength of the State's evidence." Defendant also contends that, in order to present the claim in its "proper legal form," postconviction counsel should have also asserted appellate counsel was ineffective when she did not pursue the claim on appeal from the denial of leave to file the 2006 petition.

¶ 42    After carefully reviewing the record, we find that defendant has failed to overcome the presumption that he received reasonable assistance of counsel as contemplated by Rule 651(c).

¶ 43    The purpose of Rule 651(c) is to ensure that postconviction counsel shapes the defendant's claims into a proper legal form and presents them to the court. *Perkins*, 229 Ill. 2d at 44. Counsel " 'is only required to investigate and properly present the *petitioner's* claims.' " (Emphasis in original.) *People v. Pendleton*, 223 Ill. 2d 458, 475 (2006) (quoting *People v. Davis*, 156 Ill. 2d 149, 164 (1993)). As such, Rule 651(c) "only requires postconviction counsel to examine as much of the record 'as is necessary to adequately present and support those constitutional claims raised by the petitioner.' " *Id.* at 475-76 (quoting *Davis*, 156 Ill. 2d at 164). If postconviction counsel chooses, he or she may conduct a broader examination of the record and raise additional issues, but there is no obligation to do so. *Id.* at 476.

¶ 44    Here, defendant's 2020 petition raised a claim that his sentence was unconstitutional under the reasoning of *Miller* and its progeny. It is undisputed that the 2020 petition did not include a claim of actual innocence based on newly discovered evidence. Defendant's current argument that postconviction counsel was required by Rule 651(c) to amend the 2020 petition to include an actual innocence claim "transforms the petitioner's burden of complaining of a constitutional deprivation to a burden on counsel to scour the record for such complaints; in effect, transforming what the

supreme court has explicitly stated is a matter of counsel's judgment into a legal obligation." *People v. Richardson*, 382 Ill. App. 3d 248, 258 (2008). Where counsel's duty to amend under Rule 651(c) is limited by the constitutional claims raised by the petitioner, and where the 2020 petition did not include an actual innocence claim, we cannot find that counsel did not substantially comply with the Rule. See *id.*

¶ 45 We are mindful of defendant's argument that, where Rule 651(c) requires that counsel certify he has made any amendments to the *pro se* "petitions" that are necessary for an adequate presentation of a petitioner's contentions, the Rule refers to *all* previously-filed *pro se* petitions and, by extension, claims appearing in prior petitions must be presented in an amended petition if they are meritorious. Our research has revealed no authority for this position. In support of his argument, defendant relies primarily on the dissent in *People v. Jones*, 2011 IL App (1st) 092529, ¶¶ 85, 89 (Gordon, J., dissenting), as it discusses postconviction counsel's duty to review and amend a defendant's "petitions" in the plural. However, *Jones* involved an initial petition and a series of amendments and supplements that built upon the initial petition's claims (see *id.* ¶¶ 10-15), whereas the instant case involves a series of independent petitions. Accordingly, even if the *Jones* dissent had precedential value, it would not be applicable here. The other cases cited by defendant say nothing about claims appearing in prior petitions, and, therefore, do not support defendant's argument. See *Perkins*, 229 Ill. 2d at 44; *People v. Garrison*, 43 Ill. 2d 121, 123 (1969); *People v. Slaughter*, 39 Ill. 2d 278, 285 (1968).

¶ 46 Moreover, even if, *arguendo*, we were to find that counsel should have reached beyond the claim raised in the 2020 petition, we would not find that counsel should have resurrected the actual innocence claim from the 2006 petition and re-styled it as a claim of ineffective assistance of prior

appellate counsel. It is well-established that postconviction counsel is not required to advance nonmeritorious claims on a defendant's behalf. *Pendleton*, 223 Ill. 2d at 472. As such, the determination of whether counsel acted reasonably by not amending a petition rests upon whether a defendant's postconviction claims have merit. See *Profit*, 2012 IL App (1st) 101307, ¶ 23.

¶ 47    In this case, to establish that postconviction counsel provided unreasonable assistance, defendant would be required to demonstrate that a petition amended in the manner he suggests would have stated a case upon which relief could be granted. See *People v. Vasquez*, 356 Ill. App. 3d 420, 425 (2005). That is, defendant must show that his claims, as amended, would have had merit. Thus, the question here is whether relief would be appropriate on a claim that prior appellate counsel was ineffective for failing to argue on appeal that the 2006 successive petition raised a colorable, meritorious claim of actual innocence based on Love's affidavit. See *People v. Robinson*, 2020 IL 123849, ¶¶ 44, 58 (leave to file a successive petition based on actual innocence should be denied only where the petition cannot set forth a colorable claim of actual innocence).

¶ 48    As an initial matter, we note the State's argument that defendant's 2006 petition did not raise *any* actual innocence claim predicated on Love's affidavit. Rather, the State contends, the 2006 petition solely alleged that defendant showed cause and prejudice for filing claims that the State suborned perjured testimony from Love and that trial counsel was ineffective for failing to obtain Love's affidavit and use it at trial to discredit Love's testimony. Defendant, citing *People v. Hodges*, 234 Ill. 2d 1, 9 (2009), replies that as a *pro se* pleading, the 2006 petition should be given a liberal construction, and that it is clear on its face that he was advancing an actual innocence claim.

¶ 49      We agree with defendant that, while inartful, the 2006 petition included an attempt to raise a claim of actual innocence supported by Love's affidavit. Therefore, we consider whether that postconviction claim of actual innocence had merit. Necessarily, if the claim had no merit, prior appellate counsel would not be ineffective for failing to argue on appeal that the 2006 petition raised a colorable claim of actual innocence. See *People v. Easley*, 192 Ill. 2d 307, 329 (2000) (it is not incompetence of counsel to refrain from raising nonmeritorious issues on appeal). A defendant claiming that appellate counsel was ineffective for failing to raise an issue on appeal must demonstrate that such failure was objectively unreasonable and that he was prejudiced by counsel's failure. *People v. Enis*, 194 Ill. 2d 361, 377 (2000). Unless an underlying issue has merit, there can be no prejudice from appellate counsel's failure to raise that issue on appeal. See *id.*

¶ 50      In order to succeed on a postconviction claim of actual innocence, a defendant must present supporting evidence that is (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *Robinson*, 2020 IL 123849, ¶ 47. Evidence is newly discovered if it was discovered after trial and the petitioner could not have discovered it earlier through the exercise of due diligence, material if it is relevant and probative of innocence, and noncumulative if it adds to the information that the fact finder heard at trial. *Id.* Last, the "conclusive character" element, which is the most important element of an actual innocence claim, refers to evidence that, when considered along with the trial evidence, would probably lead to a different result. *Id.*

¶ 51      The ultimate question when determining conclusiveness is whether the supporting evidence places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Id.* ¶ 48. There is no requirement that the new evidence be entirely dispositive.

*Id.* "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.* Therefore, on review, we must determine whether defendant's pleading, along with the new evidence, has raised the probability that it is more likely than not that no reasonable fact-finder would have convicted him in light of the new evidence. *Id.* ¶ 50.

¶ 52    Here, the "conclusive character" factor is dispositive. In the trial court, defendant entered a plea of guilty. The factual basis supporting defendant's plea did not include any anticipated testimony from Love. Rather, it consisted of the anticipated testimony of Randle's wife, a livery dispatcher, an Ameritech record keeper, a detective, an assistant state's attorney, and a medical examiner. Their collective, relevant testimony would have been, in summary, as follows. The dispatcher received a call about 8:45 p.m. for a driver to pick up "a single male black individual" from an address on the 4400 block of West Adams Street. She dispatched the call to Randle, and he confirmed with her when he arrived at the address. Phone records indicated the livery company received a call at 8:47 p.m. from an Ameritech subscriber, Lula Conick, with an address on the 4400 block of West Adams Street.

¶ 53    The detective learned that Lula Conick had one son, defendant, who was over the age of 13. Police officers located defendant walking down the street in the 4400 block of West Adams Street. He accompanied them to the station and made a statement to an assistant state's attorney, which was memorialized in writing. In the statement, defendant admitted that he called for a cab from his mother's house, planning to rob the driver for money for drugs. When the cab arrived, he entered the front passenger seat, produced a gun, and demanded money. As the driver attempted

to drive away, defendant shot him twice. The medical examiner determined that Randle was shot twice and died from multiple gunshot wounds.

¶ 54    This evidence was sufficient to prove defendant guilty beyond a reasonable doubt. Love's anticipated trial testimony was not utilized at the plea hearing and was not necessary to support defendant's conviction. As such, Love's recantation, even when taken as true, has no effect; it does not place the evidence on which defendant was convicted in a different light or undermine this court's confidence in the judgment of guilt. It simply is not probative of defendant's innocence. See *People v. Gharrett*, 2022 IL App (4th) 210349, ¶ 49 (rejecting postconviction claim of actual innocence where supporting affidavit did not address the ultimate issue in the case concerning the defendant's guilt and was "merely a benign gesture of support, devoid of any evidence relevant to defendant's innocence").

¶ 55    Love's assertion in his affidavit that he lied both to the police and at the mistrial when he reported that defendant confessed to him is not of a conclusive character on the question of whether defendant shot Randle. Thus, we cannot say that, by presenting Love's affidavit, defendant has raised the probability that it is more likely than not that no reasonable fact-finder would have convicted him in light of the new evidence. See *Robinson*, 2020 IL 123849, ¶ 61. Love's affidavit does not lead us to believe that, if it were considered along with the evidence that was presented as the basis for defendant's guilty plea, it would probably lead to a different result. See *id.* ¶ 60.

¶ 56    Given our determination that Love's affidavit is not of such conclusive character that it would probably change the result on retrial, we need not address whether it is newly discovered, material, and noncumulative. See *People v. Sanders*, 2016 IL 118123, ¶ 47. The actual innocence claim in the 2006 petition was without merit. Further, as the claim was without merit, prior

appellate counsel was not ineffective for failing to raise the claim on appeal from the denial of leave to file the 2006 petition. See *Easley*, 192 Ill. 2d at 329.

¶ 57    As noted above, postconviction counsel is not required to advance nonmeritorious claims on a defendant's behalf. *Pendleton*, 223 Ill. 2d at 472. Accordingly, in this case, where the underlying claim of actual innocence lacks merit, we cannot find that postconviction counsel provided unreasonable assistance by failing to amend the 2020 petition to include a claim that prior appellate counsel was ineffective for failing to argue on appeal that the 2006 petition raised a meritorious claim of actual innocence.

¶ 58    Finally, we reject defendant's argument that postconviction counsel's representation "was unreasonable on its face" where counsel filed a Rule 651(c) certificate and then made no amendments to defendant's petition when *Jones*, 2021 IL 126432, was issued nine days later. Defendant notes that, at the hearing on the State's motion to dismiss, counsel accurately acknowledged that *Jones* "directly undermined" the sentencing claim raised in the 2020 petition. He continues:

> "Post-conviction counsel seemed to be left with no argument to raise on his client's behalf, despite the strong actual innocence claim appearing in his prior petition. When post-conviction counsel essentially does nothing to serve his client, courts have found such representation to be unreasonable. See [*People v.*] *Turner*, 187 Ill. 2d [406,] 416 [(1999)] ('post-conviction counsel's performance was so deficient that it amounts to virtually no representation at all'); *People v. Jones*, 43 Ill. 2d 160, 162 (1969) (it is error to dismiss a postconviction petition where there has been inadequate representation, even if 'the *pro se* petition itself fails to present a substantial constitutional claim')."

¶ 59    We agree with the State that it is unclear what defendant believes counsel should have done in response to the issuance of *Jones*, 2021 IL 126432, beyond what he did, which was to urge the circuit court to follow that opinion's dissent and suggest that the circuit court consider a proportionate penalties argument. To the extent defendant is arguing that counsel should have raised the actual innocence claim discussed at length above, we have found that claim has no merit. Moreover, this is not a case like *Turner*, 187 Ill. 2d at 412-13, where our supreme court found that counsel should have amended claims that were raised in the defendant's petition to allege ineffective assistance of appellate counsel for failing to raise the issues on direct appeal, or like *Jones*, 43 Ill. 2d at 162, where counsel did not consult with the defendant. Defendant's argument fails.

¶ 60    In summary, postconviction counsel filed a Rule 651(c) certificate in the instant case, triggering the presumption of compliance with the rule. Where counsel's duty to amend under Rule 651(c) is limited by the constitutional claims raised by the petitioner, and where no claim of actual innocence appeared in defendant's 2020 petition, we cannot find that counsel failed to substantially comply with the Rule where he did not amend the petition to include such a claim. In addition, defendant has not demonstrated that the claim he believes counsel should have added in an amended petition had merit. Therefore, defendant has failed to rebut the presumption of compliance, and we cannot find that counsel provided an unreasonable level of assistance. Defendant's contention fails.

¶ 61    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 62    Affirmed.